236 So.2d 452 (1970)
ALTON BOX BOARD COMPANY, a Corporation, Appellant,
v.
Nicholas PANTYA, Appellee.
No. M-308.
District Court of Appeal of Florida, First District.
June 16, 1970.
Marks, Gray, Yates, Conroy & Gibbs, Jacksonville, for appellant.
Blalock, Holbrook, Lewis, Paul & Bennett, Jacksonville, for appellee.
*453 RAWLS, Judge.
In this air pollution damage case, appellant-defendant, Alton Box Board Company, appeals from a final judgment based on a jury verdict for plaintiff in the sum of $1,200.00.
The primary point posed by appellant is: Does the evidence received show, or reasonably infer, that any act of the defendant, or any substance emanating from its mill, proximately cause the damage and injury of which plaintiff complained?
Plaintiff Pantya, who lives in the area of Jacksonville near Alton Box Board Company's plant, brought this action for personal and property damages due to pollutants emitting from defendant's plant. Thomas B. Ard, a registered engineer and director of Air and Water Pollution for the City of Jacksonville, testified that defendant's plant is in the area of heaviest pollution. Defendant has two tall stacks; from a recovery stack comes a white emission composed of sodium carbonate, carbon dioxide, nitrous oxide, and sodium sulfate; from the bark and power boiler stack comes a dark emission composed of sulfur dioxide and small pieces of partly burned bark, charcoal-like in nature, called fly ash and bunker-C fly ash. Although not an acid itself, acids will attach to bunker-C fly ash. The sulfur dioxide is one of the main problems in air pollution. The damage it does to vegetation can be seen with the naked eye. Ard further testified that the sulfur dioxide comes out of the stack as SO[2] and SO[3] and is converted to sulfuric acid in the abundant moisture in the Jacksonville area. Although he is not a chemist and could not testify as to its effect on aluminum, metals, or people, he nevertheless stated that sulfur compounds in the fallout in the City turn lead base paints black, and turn paints, using a mercury compound as a fungicide, brown. The emissions from the stacks are not a homogeneous mix so one house in any area may receive more of a particular gas than another. Winds, humidity and air pressures have a definite effect on which area receives the fallout, and the plaintiff's home at times could receive fallout from plants five miles away. Ard also testified that Alton Box has two lime kilns from which come calcium hydroxide, an alkaline product. The samplings made by his agency do not measure the amount of chemicals in the emissions, but do indicate the total weight of the emissions from the stacks. A sampling taken March 4, 1969, showed that the total emission at that time was 35.9 pounds per hour above the allowable amount. Alton Box uses good control equipment to minimize the weight of the emissions, but, as the plant manager explained, a change in operation in the plant can affect what comes out of the stacks. Near Alton plant is the Kennedy generating plant, but it does not burn bark (as does Alton Box), only bunker-C oil (subject to City control as to sulfur content); it operates at extremely good efficiency and its emissions are composed of bunker-C fly ash which is not an acid.
A contractor testified as to the damage done to the house, carport, etc., and particularly aluminum and metal, including the damage done to the aluminum windows (corroded and pitted) which he had installed only two years previously. Six people (the Pantyas, their son and three neighbors) testified that when there is a northwest wind, they can stand on their porches and see the materials coming out of the Alton Box stack; it forms a cloud over the area in which they live and falls on everything. It was described as specks like tobacco juice, huge black smut-looking things, big as a fingernail, ashes, etc. These particles eat up clothes hanging on the line, make brown spots where they land on buildings, can't be washed off the house or cars because it smears in water and a residue remains; and it causes burning of the eyes. It causes Mr. Pantya's throat to burn, his nose to bleed and his chest becomes congested. One neighbor testified that the cloud settles in the area as if it were a pocket, and she had seen it occur more than 100 times.
*454 Defendant's plant manager viewed the Pantya home and testified, "In my best judgment anything we could discharge would not do what I saw." Defendant's witness Green, who is under contract to care for the plant grounds testified that his equipment and the plant grounds did not suffer any damage, and that plaintiff's rose bushes, crape myrtle and arborvitae were in good condition.
Appellant's primary contention is that no expert proof was adduced by plaintiff showing that the fallout caused the metal corrosion or personal injuries. Appellee takes the position that since six lay witnesses testified that they could see the pollutants coming from defendant's stacks, and saw same travel through the air and land on plaintiff's property, it was unnecessary to have an expert testify that the emissions from the plant did cause the damages. We conclude that plaintiff presented adequate testimony for the trial judge to submit to the jury the critical question of causal relationship. The question of when expert testimony is essential in proving a particular issue is determined by the issue involved.
This Court in Puleo v. Shaw, 149 So.2d 880, 883 (Fla.App. 1st 1963), which involved a whiplash injury, held:
"It was the doctor's medical opinion that the minor boy had suffered what is commonly known as a whiplash injury, which is of a type not readily detectible from casual observation and which, as in this case, is not totally disabling. This proof was uncontradicted by any other medical testimony. It appears to be generally accepted that where injuries are of such a character as to require skilled professional persons to determine the nature, extent and duration thereof, and the proper procedures for treatment, the question is one of science and must be determined by skilled professional persons. Testimony thus adduced may not be arbitrarily disregarded by the finders of fact when not contradicted by proof of equal dignity, nor open to doubt from any reasonable point of view."
Appellant urges that the critical question in the instant cause is one of science and must be determined by skilled professional persons; and that the absence of any testimony being proffered by plaintiff of such skilled professionals is fatal to plaintiff's cause. Had our opinion in Puleo, supra, been the last word upon this issue, we would have been inclined to agree. However, the Supreme Court of Florida quashed the foregoing opinion in Shaw v. Puleo, 159 So.2d 641, 644 (Fla. 1964), and held, inter alia:
"So, too, where there are in fact conflicts which arise in testimony given during the trial, it is the function of the jury to resolve them and it is within their province to reject the expert testimony and rely on lay evidence. Gulf Life Insurance Co. v. Shelton, 155 Fla. 586, 21 So.2d 39.
"For these reasons we must reiterate that even though the facts testified to by Dr. Albee were not within the ordinary experience of the members of the jury, the jury was still free to determine their credibility and to decide the weight to be ascribed to them in the face of conflicting lay evidence."
Also see: Atkins v. Humes, 110 So.2d 663 (Fla. 1959).
It necessarily follows that if the jury is at liberty to reject expert testimony and accept lay testimony as to a question involving facts not within the ordinary experience of members of the jury, then such facts may be proven by lay testimony. We hasten to add that such rule is not applicable in all cases involving a question of science or other matters falling within the expertise of those skilled in a particular area of knowledge. We do say that if expert testimony may be repudiated by lay testimony involving a whiplash injury case, then expert testimony is not as a matter of law required to prove damages in the instant *455 cause where six lay witnesses graphically described the pollutants and resulting damage sustained. This is especially true where no expert testimony was submitted in rebuttal as to the chemical properties of the pollutants emitted by defendant's plant or the inability of same to cause the damage alleged.
We have carefully considered appellant's remaining three points on appeal and conclude that same are without merit.
Affirmed.
JOHNSON, C.J., and SPECTOR, J., concur.